**[Cite as *In re C.B.*, 2024-Ohio-5352.]**

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
HURON COUNTY

In re C.B.

Court of Appeals No.   H-24-011
                       H-24-012

Trial Court No.  DNA 2022 00025

**<u>DECISION AND JUDGMENT</u>**

Decided:  November 8, 2024

* * * * *

Richard H. Palau, for appellee.

W. Alex Smith, for appellant.

* * * * *

**DUHART, J.**

**{¶ 1}** This is a consolidated appeal from the March 8, 2024 judgment of the Huron

County Court of Common Pleas, Juvenile Division, terminating the parental rights of

appellant, Co.B., the father of minor child, C.B., and granting permanent custody of the

child to appellee, Huron County Department of Job and Family Services ("the agency").

For the reasons that follow, we affirm the judgment.

**{¶ 2}** Father sets forth one assignment of error:

The Trial Court erred by granting the Agency's motion for permanent custody.

## Background

**{¶ 3}** C.B. was born in May 2018, to father and mother, A.K. Mother also has another child, P., C.B.'s older half-brother, who was fathered by a different man. Mother and P. are not involved in this appeal, but they will be mentioned when pertinent to this appeal. When C.B. was born and for several years thereafter, he lived with mother, father and P.

**{¶ 4}** In September 2020, the agency became involved with C.B. and the family due to a domestic violence ("DV") incident between mother and father in front of P. and C.B. The agency opened an alternative response investigation after it learned that police were called because the parents were arguing all day and mother spit her dentures out at father, so he pushed her then he went to his grandmother's house with C.B. Father told police that mother hurt him, and she was using drugs. Mother took a drug test; it was negative. She filed for a protection order that provided that father was not allowed to be at her home, and she was linked to victim's assistance resources. The agency closed the investigation in November 2020.

**{¶ 5}** In September 2021, the agency again became involved with the family due to a report of DV between the parents who had allegedly been arguing in front of P. and C.B. because father changed C.B.'s dirty diaper, threw the dirty diaper down the stairs

2.

and the contents went all over. Mother picked up the diaper and put it in father's face. She said he hit her in the face, and she had a red mark on her face. Police responded. Mother had a warrant for failure to appear for a previous disorderly conduct offense, so she was arrested. Father left the home on foot. The children went with an aunt until mother bonded out of jail. The agency worked with mother on a voluntary case and provided her with resources because she said she was depressed and wanted to get help.

{¶ 6} The agency planned to close the voluntary case, but on January 20, 2022, a new alternative response investigation was opened due to another DV incident between the parents who were fighting and mother went to her room and shut the door to get away from father, but he pushed the door open while she sat holding it shut. Mother had marks on her back and bicep. The agency again provided resources, and the family agreed to a voluntary case plan. Mother filed a protection order against father, but in February 2022, she tried to have it dismissed; the court would not allow a dismissal.

{¶ 7} On February 24, 2022, the agency's caseworker conducted an unannounced visit at mother's home and found father in the bathtub. Since he was not allowed at the home or around mother and the children, the children were safety planned with mother at P.'s dad's home.

{¶ 8} On February 25, 2022, the agency filed a complaint alleging the children were dependent pursuant to R.C. 2151.04(C). A shelter care hearing was held that same day and the children were removed from the home. C.B. was placed in the temporary custody of his maternal aunt and P. was placed in the temporary custody of his dad.

3.

{¶ 9} On March 3, 2022, a case plan was filed, with three concerns: (1) mother's mental health and DV relationship for five years; (2) father's mental health and violent behaviors and DV charge from January 2022 involving mother; and (3) C.B. may be behind developmentally, he was three and one-half years old, still in diapers and not talking.

{¶ 10} On March 29, 2022, the aunt was hospitalized and could not care for C.B. Also, the agency learned that the aunt allowed her boyfriend to be around C.B., despite being told by the agency that the boyfriend was to have no contact due to his significant Ohio child welfare history, which included substantiated physical and sexual abuse. The agency located C.B. at mother's parents' house. Mother's parents were unwilling to keep C.B. due to their health concerns. An emergency shelter care hearing was held at which the agency received temporary custody of C.B., and mother and father were granted supervised visits. C.B. was placed in a foster home.

{¶ 11} On March 30, 2022, an updated case plan was filed, with three concerns: (1) mother's mental health and admitted substance abuse history; (2) father's mental health, substance abuse and violent behaviors; and (3) C.B. may be behind developmentally.

{¶ 12} On May 11, 2022, the adjudicatory hearing was held and the court found C.B. and P. were dependent children. Thereafter, the dispositional hearing was held. The court found there were no appropriate relatives willing to be temporary custodians of C.B. and ordered his placement with the agency to continue.

4.

{¶ 13} On July 8, 2022, an updated case plan was filed, with four concerns: (1) mother's mental health and substance abuse; (2) father's mental health, violent behaviors and substance abuse; (3) C.B. may be behind; and (4) P. struggled with emotions and behaviors due to past trauma.

{¶ 14} On May 24, 2023, the agency filed a motion for permanent custody of C.B. pursuant to R.C. 2151.413(A) and (D)(1) and R.C. 2151.414. The agency asserted C.B. had been in its temporary custody for 12 or more months of a consecutive 22-month period and cannot or should not be placed with either parent within a reasonable time. The agency detailed certain facts in support of its motion, including the following.

{¶ 15} Mother - she had an assessment and started mental health counseling twice but was discharged both times for not attending; she was not currently participating in counseling that the agency could verify. She tested positive for drugs, such as meth and Oxycodone on numerous occasions. The agency was concerned that she continued to have contact with father and their relationship status was unclear. She had stable housing through HUD/CAC but did not have a job or show proof that she applied for Social Security Disability. Her supervised visits with C.B. were consistent and appropriate, and sometimes P. would also visit with C.B.

{¶ 16} Father - he was uncooperative with the agency with home visits until December 6, 2022. He was ordered to attend anger management due to a warrant out for his arrest through probation, but he failed to do so. He did not attend the Batterer's Intervention Program ("BIP") or a mental health assessment or treatment, as required by

5.

the agency. On June 24, 2022, the police were called for a disturbance at mother's home, as she and father were fighting and a neighbor heard them; this was a violation of the protection order and father's probation. Father was continually in contact with mother despite the protection order. There were numerous police interactions and reports regarding mother and father: 9/28/20 - DV; 7/20/21 - arrest on warrant for DV; 7/29/21 - verbal altercation between mother and father; 11/25/21 - disorderly conduct; 1/7/22 - disorderly conduct; 3/19/22 - domestic dispute; 3/29/22 - disturbance between mother and father; 6/24/22 - DV; 9/19/22 - disturbance between mother and father; 11/28/22 - father's drug use; and 12/23/22 - father arrested for operating a vehicle under the influence ("OVI") and having meth. Father was in a 90-day inpatient treatment program because he had two positive drug screens for his probation officer, and father was unemployed. When not at the inpatient facility, father resided with his grandmother and father; there were concerns about the home due to the residents, their mental health and substance use. Father had minimal visits with C.B.; there were two supervised visits at the agency on 3/18/22 and 3/25/22. Father failed to respond to agency attempts to contact him to schedule visits until April of 2023, before he was sent to inpatient treatment. Then, visits were virtual and were difficult because C.B. was shy and not willing to engage.

{¶ 17} C.B. - he was three years old when he came into agency and was still in diapers, drank out of a bottle, was unable to use words, mostly communicated by grunting, and he was obese, to the point it impacted his balance. The foster parents

6.

worked extensively with C.B., such that C.B. did not use a bottle, was potty trained, lost a significant amount of weight and was involved in various sports and activities. In addition, C.B.'s speech improved, he was on an Individualized Educational Plan ("IEP"), he attended speech therapy through school and a hospital. He was being evaluated for delayed processing and sensory impairments, he was being evaluated by neurology, he was scheduled for a sleep study, and he was referred for developmental delay testing. C.B. struggled with behaviors, including screaming, crying, throwing fits in public and emotional outbursts surrounding visits with mother and father. The foster parents worked with organizations as C.B. needed continued support and follow-through with medical and counseling needs.

{¶ 18} On February 27, 2024, father filed a motion for legal custody of C.B.

{¶ 19} On March 5, 2024, the permanent custody trial was held; mother and father attended. On March 8, 2024, the juvenile court issued its judgment entry granting permanent custody of C.B. to the agency on the bases of R.C. 2151.414(B)(1)(a), (d) and (D)(1). Father appealed.

## Permanent Custody Law

{¶ 20} The juvenile court may grant permanent custody of a child to a children services agency if the court finds, by clear and convincing evidence, two statutory prongs: (1) the existence of at least one of the four factors set forth in R.C. 2151.414(B)(1)(a) through (e); and (2) the child's best interest is served by granting permanent custody to the agency. *In re A.H.*, 2011-Ohio-4857, ¶ 12 (6th Dist.). Clear

7.

and convincing evidence requires proof which "produce[s] in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

**First Prong**

{¶ 21} The relevant provisions of R.C. 2151.414(B)(1) state:

> [T]he court may grant permanent custody of a child to a movant if the court determines . . . by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody . . . to the agency . . . and that any of the following apply:
> (a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies . . . for [12] or more months of a consecutive [22]-month period . . . and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.
> . . .
>
> (d) The child has been in the temporary custody of one or more public children services agencies . . . for [12] or more months of a consecutive [22]-month period, or the child has been in the temporary custody of one or more public children services agencies . . . for [12] or more months of a consecutive [22]-month period[.]

{¶ 22} When calculating "12 of 22" time, the operative beginning date (when the child is considered to have entered the temporary custody of an agency) is the earlier of the date of the adjudication or 60 days after the removal of the child from the home. *In re A.C.*, 2006-Ohio-3337, ¶ 11 (9th Dist.). The operative ending date is the date the motion for permanent custody was filed. *Id.* at ¶12, citing *In re C.W.*, 2004-Ohio-6411, ¶ 24 ("'[A] motion for permanent custody must allege grounds that currently exist.' *In re K.G.*, 2004-Ohio-1421[,] * * * ¶ 13 [(9th Dist.)]. A juvenile court lacks authority to grant

8.

an agency's motion [on "12 of 22"] grounds if those grounds were not satisfied when the motion was filed.").

{¶ 23} R.C. 2151.414(E) sets forth the elements necessary to satisfy a determination under R.C. 2151.414(B)(1)(a), that the child cannot or should not be placed with either parent within a reasonable time. *See In re Schaefer*, 2006-Ohio-5513, ¶ 38. The relevant provisions of R.C. 2151.414(E) state:

> (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.
> . . .
>
> (4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child[.]

**Second Prong**

{¶ 24} This prong concerns the best interest of the child, and when the juvenile court is making this determination, R.C. 2151.414(D)(1) provides that all factors which are relevant shall be considered by the court, including, but not limited to:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

9.

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child[;]

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ 25} R.C. 2151.414(E)(10) provides a "parent has abandoned the child." R.C. 2151.011(C) states "a child shall be presumed abandoned when the parents of the child have failed to visit or maintain contact with the child for more than [90] days, regardless of whether the parents resume contact with the child after that period of [90] days."

## Permanent Custody Trial

### Jodi Moen

{¶ 26} Ms. Moen testified that she was the agency's ongoing caseworker who worked with the family, starting in February 2022. She met mother, went to mother's home and found father in the bathtub. Father left and mother and the children went to P.'s dad's house for the night. Thereafter, P. stayed at his dad's house and C.B. was placed in the temporary custody of mother's sister (C.B.'s aunt), which lasted for one month due to the aunt's hospitalized and also because the aunt's boyfriend, who was unsafe, was around C.B. Temporary custody of C.B. was granted to the agency. Relative placements for C.B. were explored, but none were suitable.

10.

**{¶ 27}** Father's initial case plan was for his mental health, drugs and alcohol, announced and unannounced home visits, BIP, employment, releases and drug screens. Father was not engaged in the case plan until, through his probation for a DV case and substance abuse case, he was court-ordered to attend mental health and substance abuse services, including inpatient treatment. Father had a positive screen for Percocet in September 2023, and a positive screen for Oxycodone on February 6, 2024. He did not complete BIP and went to jail for 10 days rather than participate in anger management as required by his probation officer. By the time of trial, he had completed anger management.

**{¶ 28}** Father lived with his grandmother, who was in her 90s, and his parents lived two houses away. Father's father has substance abuse issues. Father was employed full-time doing masonry, third shift. When father was in inpatient treatment, he had about five Zoom visits with C.B., but C.B. was hysterical and cried uncontrollably the whole visit, every Zoom visit, although father tried to calm C.B. down. Since father left inpatient treatment and has lived with his grandmother, Moen scheduled in person visits for C.B. and father, but father was a no-call, no-show.

**{¶ 29}** Father failed to cooperate for the last two years with monthly home visits. Moen went to the grandmother's house and made three attempts at visits each month and left a card. Father called Moen only twice in two years. Also, in December 2022, at a home visit, father was nasty to Moen; otherwise, he was usually nice.

11.

{¶ 30} Mother's initial case plan was for her mental health, drug and alcohol abuse, announced and unannounced home visits, employment and drug screens. She was not cooperative for the last two years for unannounced home visits, which Moen attempted at least three times per month so that mother could be drug-tested; mother did not answer the door or call Moen after Moen left a card at the house. After a few months, Moen did visits after mother's visitations with C.B., which mother did not like at all. Mother was nasty to Moen, yelled, hollered and screamed at Moen, and did not answer Moen's questions. Moen's last drug screen for mother was in February 2023, due to mother's lack of cooperation; the screen was positive for drugs.

{¶ 31} Mother was unemployed the entire case, and did not provide documentation that she applied for disability. Mother was asked to produce her prescription bottles with the pills so the pills could be counted to ensure she was taking her prescriptions properly. In January 2024, she brought in prescription bottles with no pills, with some current and some old prescriptions. She attended mental health and drug and alcohol counseling since January 2024 and was drug-tested there; in February 2024, she tested positive for meth and in late February 2024, she was positive for THC, Adderall and Oxycodone.

{¶ 32} Mother's visits with C.B. went well and sometimes P., C.B.'s older half-brother, joined the visits. C.B. was very bonded with P., and they played together, laughed and had a good time. C.B. enjoyed the visits with mother when he was there, but he struggled before and after the visits. Before visits, C.B. would scream, cry, throw fits

12.

and not want to go. After visits, C.B. had meltdowns, he would stick his finger down his throat to try to vomit, he had trouble sleeping that night, he was jealous of the children in the foster home, he would not share toys, and he would sit on the couch and cover his face.

{¶ 33} When the agency received temporary custody of C.B., he was almost four years old, in diapers, on a bottle and obese. He had a very hard time walking; he was unstable and would fall a lot because his midsection was large, and it affected his balance. Once he went to the foster home, the foster parents potty-trained him, removed the bottle and due to the foster family's active lifestyle, C.B. lost half of his body weight. C.B. went to preschool and had an IEP for speech because he did not talk much. At first, he struggled a little bit because he was not able to communicate well with the kids, but he progressed. He still had an IEP for speech, bathroom breaks (due to one of kidneys not emptying completely) and sensory breaks if he was overstimulated. Initially, C.B. had a tablet to help with speech, but he no longer needed it, as he was doing well telling you or trying to express how he feels or what he needs.

{¶ 34} In October 2022, C.B. had surgery and was re-circumcised because the end of his penis was purple from being restricted. He also had tooth decay and cavities, and had teeth removed and cavities filled.

{¶ 35} At the time of trial, C.B. was in kindergarten and received occupational therapy, speech therapy, behavioral services and play therapy.

13.

**{¶ 36}** The foster parents have three boys of their own, ages 13, 7 and 4. C.B., aged 5, sleeps in a bedroom with the 4-year-old.

**Carrie Kimmet**

**{¶ 37}** Ms. Kimmet testified that she was assigned as the guardian ad litem ("GAL") for C.B. in February 2022. She first met C.B. at his aunt's house. C.B. was non-verbal, made noises and still wore a diaper. Kimmet went outside with C.B. to play ball, but he was not very good at catching or throwing. She next saw C.B. at the foster home. He was unable to climb stairs, had serious weight issues, mobility issues and speech issues. While at the foster home, his mobility improved dramatically with the weight loss, he was no longer on a bottle, he was potty-trained, he talked a lot more, but his words were difficult to understand, he attended school, his relationship with other children was good for the most part and he had surgery due to decayed teeth.

**{¶ 38}** Kimmet met father at the shelter care hearing and spoke with him quite a bit after the hearing. She never observed father's visits with C.B. She was on Zoom with father twice, when he was in inpatient treatment, and he was very receptive. She was aware that father had a DV conviction with mother, a DV conviction in 2015, before C.B. was born, an OVI and a drug charge.

**{¶ 39}** Kimmet believed it was in C.B.'s best interest to remain at the foster home and for permanent custody to be granted so he can be adopted by the foster parents. She did not think C.B. could be safely or reasonably reunified with his parents at this time. C.B. made tremendous progress at the foster home and continues to make progress and

14.

his medical needs have been met. Kimmet has concerns about the parents' drug use and serious concerns about father's lack of visitation with C.B. Kimmet did not believe father met his case plan objectives as he did not complete BIP, he has not had continued sobriety, and he was not meeting with the caseworker on a random basis for drug screens.

{¶ 40} Kimmet was asked how many GAL reports she filed, but she did not know. She did not file a report prior to trial.[1]

**Foster Mom**

{¶ 41} C.B.'s foster mom testified that she has been married for nine years and her husband works first shift at a prison.

{¶ 42} When C.B. arrived at her home almost two years ago, he was obese, his balance was off, he wore adult-sized diapers and was not potty-trained, he had rotten teeth, had an infected penis, had no speech, would moan or point, woke up crying multiple times a night, had night terrors, was afraid of showers and afraid of almost everything. Foster mom talked to a nutritionist so C.B. would have balanced meals, C.B. played soccer and did Healthy Kids Running, he was taken to a specialist for his infected teeth and a urologist for his infected penis, he took speech therapy right away and occupational therapy for a few months. C.B. was on antibiotics for a while for his teeth and penis.

{¶ 43} C.B. was enrolled in pre-school which "was the best decision we ever made, because I didn't expect him to be so outgoing for not being able to talk as much.

---

[1] It appears, from our review of the record, that the GAL did not file any reports.

15.

He was excited about it." C.B. had an IEP right away to make sure he had services at school. He did not know his ABCs or how to count to 10. C.B. was signed up for counseling, which helped with his transition to school and with social skills, as C.B. was a follower and needed to build skills to say no. By the first two or three weeks of school, C.B. had lost about 42 pounds (he had been 90 pounds) and was no longer considered obese.

{¶ 44} When C.B. had visits with mother (he did not have visits with father at that time), he had behaviors including putting his hands down his throat before visits, throwing himself on the ground and refusing to put on his shoes. C.B. had play-based therapy to help with before and after visits.

{¶ 45} C.B. started to play basketball and T-ball and was involved with OhioRise, which helped the foster mom get C.B. to a neurologist and get him a communication devise. C.B. also participated in Empower, to help with past trauma, which he truly needed. As a result of all of the services, C.B. "had a new confidence about himself." In addition, C.B. was in a sleep study to help with his sleeping problems and night terrors.

{¶ 46} C.B. was in an inclusion classroom at school, since he scored below average for kindergarten screening. OhioRise and Empower workers went to school to evaluate C.B. and they said he was so bright, he listens, he was engaging, and he wants to learn.

{¶ 47} The IEP helped C.B., as he was easily overwhelmed, so he had sensory breaks, he had speech goals, seating accommodations because it was really hard for him

16.

to sit still in a structured setting, and bathroom accommodations due to his kidney problem.

{¶ 48} C.B. had to have x-rays every six months to make ensure his kidney was healthy, and he was on a waiting list for a developmental doctor due to suspected aphasia or apraxia because of how he formed his mouth when reading and his inability to repeat certain things.

{¶ 49} Foster mom said C.B. was thriving. She "watched him from an obese child [who] didn't understand emotions or how to talk, come to talking, being confident in himself, being able to express himself, [and being] . . . a healthy active child." She and her husband want to adopt C.B., but she wants what is best for C.B.

{¶ 50} Foster mom had contact with father over Zoom and said he was very pleasant and understanding when C.B. was screaming and crying during visits.

**Judgment Entry**

{¶ 51} The juvenile court detailed the agency's involvement with the family, starting in November 2021, after the agency received concerns about a pattern of DV in the home involving the parents and witnessed by the children. The agency started with a voluntary case, followed by a safety plan after another DV incident occurred and a protection order was issued, and lastly, a complaint was filed after father violated the safety plan. The children were removed from the home; P. was placed with his dad and C.B. was ultimately placed in a foster home, where he has remained for more than 23 months. The children were adjudicated dependent.

17.

{¶ 52} Case plans were adopted which required, inter alia, that father attend and complete substance abuse and mental health treatment, take medication as prescribed and attend and complete a BIP. Father was initially not compliant, but after he violated the terms of his probation in his criminal case, he began to be engaged. He entered inpatient treatment in southern Ohio in April 2023, completed it in July 2023, but continued to struggle with his substance abuse and mental health, so he returned to the program for another 30-day stay in the fall of 2023.

{¶ 53} At the time of trial, father was participating in outpatient treatment associated with his criminal case and was in Phase 2 of a five-phase program. He lived with grandmother and was waiting for an opening in a sober living facility. He tested positive for Percocet in September 2023, and for Oxycodone on February 6, 2024. He never started BIP, which was typically a six-month program. He did complete anger management.

{¶ 54} Father had limited contact with C.B. during the case; he had two supervised visits before he left for inpatient treatment and Zoom visits while in the facility. There were no visits since July 2023, even though transportation was available to father when he lived with his grandmother.

{¶ 55} When C.B. was removed from the parents' home, he was three years and nine months old, wore diapers, was non-verbal, fed through a bottle, was morbidly obese with very limited mobility and his teeth had decayed so badly that he required oral surgery. A psychiatrist diagnosed C.B. with Post Traumatic Stress Disorder ("PTSD")

18.

and anxiety following his experiences with his parents, and C.B. suffered from cognitive disabilities.

{¶ 56} While in the care of his foster parents, C.B. began to flourish. He received a variety of professional services for his many needs, including occupational and speech therapy, counseling, and he was provided with a tablet to assist with his communication. His foster parents consulted a nutritionist who developed a diet for C.B. which led to a healthy weight reduction and improved mobility. C.B. is now able to communicate his needs and is working on managing his emotions.

{¶ 57} C.B. attended kindergarten at the same school where his foster mother worked as a paraprofessional. C.B. has an IEP to accommodate his limitations and needs. C.B. was very bonded with his foster parents and their children. The foster parents intend to adopt C.B. if the agency's permanent custody motion is granted. C.B. was also very bonded with his half-sibling, P., and the foster parents were willing to allow this relationship to continue after adoption, provided it was healthy and safe for C.B.

**First Prong of Permanent Custody Analysis**

{¶ 58} Based on the evidence at trial, the court found clearly and convincingly that C.B. was in the temporary custody of the agency for almost 24 consecutive months. R.C. 2151.414(B)(1)(d). Also, the court clearly and convincingly found that C.B. cannot be placed with either of his parents within a reasonable period of time and should not be placed with them. R.C. 2151.414(B)(1)(a). The court concluded that each parent "'failed continuously and repeatedly to substantially remedy the conditions causing the child to be

19.

placed outside the child's home.'" R.C. 2151.414(E)(1). The conditions at the parents' home before C.B.'s removal included a repeated pattern of DV between the parents, their respective substance abuse and mental health conditions, and more than two years after removal, father had not even begun the BIP, and both parents continued to have screens that were positive for controlled substances. The court found that father "'demonstrated a lack of commitment toward [C.B.] by failing to regularly ... visit, or communicate with [C.B.] when able to do so.'" R.C. 2151.414(E)(4). Father's last visit with C.B. was a Zoom visit in July 2023, although father was 40 minutes away from C.B. and had transportation available when father lived with grandmother.

**Second Prong of Permanent Custody Analysis**

{¶ 59} The court considered the best interest factors in R.C. 2151.414(D), and noted C.B. was very bonded with his foster family, he was attached to P., and the foster parents intended to enable the sibling relationship as long as it was healthy and safe. C.B.'s visits with his parents were appropriate, but he had no contact with father since July 2023.

{¶ 60} C.B. had not reached a developmental level to convey his wishes or concerns about the case, but his GAL and attorney both supported the motion for permanent custody and believed it was in C.B.'s best interest. A legally secure placement was necessary for C.B., and an award of permanent custody to the agency would enable the foster parents, with whom C.B. lived since March 2022, to pursue adopting C.B.

20.

{¶ 61} The court found clearly and convincingly that it was in C.B.'s best interest to grant the agency's motion for permanent custody. "The conditions and environment in which [C.B.] lived until this case was filed contributed to profound delays in development and mental health and medical conditions. Fortunately, under the loving care of his foster parents and with the numerous and intensive professional services provided to him, the tide has turned dramatically[,] and [C.B.] is thriving."

**Father's Assigned Error**

{¶ 62} Father argues the court erred by granting the agency's motion for permanent custody. He submits it is undisputed that C.B. was in the temporary custody of the agency for almost 24 consecutive months, satisfying the statutory requirement of RC. 2151.414(B)(1)(d), but he disputes the court's find that permanent removal is in the best interest of the child.

{¶ 63} Father contends he completed numerous parts of his case plan, he secured appropriate housing, he was employed, he engaged in substance abuse treatment, and he did not cause physical harm to C.B. Father acknowledges he did not complete BIP, as the agency asked, but he completed anger management, giving him the requisite tools to deal with any underlying issues with aggression.

{¶ 64} Father admits that he had a few positive drug screens, yet he largely submitted negative screens and remained in treatment. He further argues that he was not in possession of his child, nor was he engaged in a visit with his child while under the influence, so while drug usage is not preferred, it was clearly not impacting his ability to

21.

parent. Father claims that the primary reason for C.B.'s removal was alleged DV incidents, not drug usage, so father's sporadic drug use did not contribute to the child's continued removal and father's treatment caused his drug use to be sufficiently mitigated.

{¶ 65} Father insists he secured safe and stable housing and has a job which allows him to provide for the care and welfare of C.B. Father maintains there was no reason that he could not have been the legally secure permanent placement that the agency sought. He queries: What more could he have done? What is the purpose of a case plan if completing significant parts of it doesn't get your child returned to you?

{¶ 66} The agency counters that father's assertions are as naked as he when he was found naked in the bathtub in violation of the safety plan which was the beginning of the case. The agency contends that father tested positive for Oxycodone on February 6, 2024, which was less than a month before the March 5, 2024 trial and while he was in the second phase of a five-phase outpatient treatment program. The agency argues that father never took BIP and had no visits with C.B. since July 2023.

{¶ 67} The agency asserts the juvenile court's finding by clear and convincing evidence is not against the manifest weight of the evidence, and the court was in the best position to consider the credibility of witnesses, as they appeared in front of the judge.

**Standard of Review of Permanent Custody Determination**

{¶ 68} Father did not refer to a standard of review in his brief, while the agency set forth the standard of review is clear and convincing evidence and also mentions manifest weight of the evidence.

22.

**{¶ 69}** A review of the law shows that in *In re Z.C.*, 2023-Ohio-4703, ¶ 1, the Supreme Court of Ohio held that "the proper appellate standards of review to apply in cases involving a juvenile court's decision under R.C. 2151.414 to award permanent custody of a child and to terminate parental rights * * * are the sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence standards." The appropriate standard to apply depends on the nature of the arguments presented by the parties. *Id.* at ¶ 11.

**Standards Defined**

**{¶ 70}** Sufficiency of the evidence is a test of adequacy. *State v. Thompkins*, 78 Ohio St.3d 380, 386, (1997). "Whether the evidence is legally sufficient to sustain a verdict is a question of law.'" *Id.*

**{¶ 71}** Manifest weight of the evidence "'depends on [the evidence's] effect in inducing belief.'" (Emphasis deleted.) *Thompkins* at 387, quoting Black's Law Dictionary 1594 (6th Ed.1990). When reviewing for manifest weight, the appellate court weighs the evidence and all reasonable inferences, considers the witnesses' credibility and decides whether, in resolving evidentiary conflicts, the judge lost his way and created a manifest miscarriage of justice such that the judgment must be reversed and a new trial ordered. *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20.

**Analysis**

**{¶ 72}** After examining the arguments of father and the agency, we find the manifest weight of the evidence standard applies to our review of the juvenile court's decision that R.C. 2151.414(B)(1)(a) applied.

23.

{¶ 73} With respect to the juvenile court's decision that R.C. 2151.414(B)(1)(d) applied, we find the proper standard under which we review this decision is sufficiency of the evidence. While father indicates it is undisputed that C.B. was in the temporary custody of the agency for almost 24 consecutive months, satisfying the statutory requirement, the record shows that C.B. was adjudicated dependent on May 11, 2022, and the motion for permanent custody was filed on May 24, 2023, which is not a 22-month period. As set forth above, a motion for permanent custody must allege grounds which exist at the time the motion is filed. Since C.B. was not in the agency's temporary custody for 22 months when the motion was filed, the agency had no basis to move for permanent custody of C.B. under the "12 out of 22" provision. We therefore conclude that juvenile court's finding that the "12 out of 22" provision applied is not supported by sufficient evidence.

{¶ 74} Concerning the juvenile court's finding that R.C. 2151.414(B)(1)(a) applied, that C.B. could not and should not be placed with father within a reasonable time, we find, based on our review of the entire record, that this is not the exceptional case in which the trier of fact clearly lost its way and created a manifest miscarriage of justice by finding that permanent custody was in C.B.'s best interest.

**First Prong of Permanent Custody Analysis**

{¶ 75} The record reveals that father has had anger management issues for years, he has a criminal history, and he violated the protection order numerous times which required him to stay away from mother. He also has substance abuse issues as evinced

24.

by positive drug screens and the need for in-patient and out-patient treatment. Notwithstanding treatment, father continued to have positive drug screens. At the time of trial, he lived with his grandmother, who was in her 90s and she provided transportation for him, and he was employed, full-time, working third shift.

{¶ 76} The record further shows that despite the services offered to father by the agency to assist him in remedying the issues which caused C.B. to be placed outside of the home, include DV incidents, father failed to make significant progress in those services, and he completely failed to engage in BIP. Father was not initially compliant with his case plan, and only participated in services when he was court-ordered through his probation to attend mental health and substance abuse treatment. Yet, he still had positive drug screens. Father only visited C.B. in-person two times since C.B. was removed from the home, in March 2022, and had about five virtual visits with C.B. between April and July 2023, which visits were not good for C.B. Father has had no contact whatsoever with C.B. since July 2023. This demonstrates a lack of commitment by father, and also constitutes abandonment, although the juvenile court did not make that specific finding.

**Second Prong of Permanent Custody Analysis**

{¶ 77} The record further shows that when the agency became involved with the family, C.B. was almost four years old, was still using a bottle, in diapers, obese, nonverbal and had infected teeth and an infected penis. Under the care of his foster parents, C.B. was taken off of the bottle, was potty-trained, participated in sports, lost

25.

almost half of his body weight, was in speech therapy and occupational therapy, had dental surgery, was re-circumcised, was given antibiotics for his infections, was enrolled in pre-school and then kindergarten, was placed on an IEP, received medical care for his kidney, received and used a tablet to assist him with his communication, was able to talk in short sentences to express his needs and emotions, participated in therapies and other services to treat his PTSD, anxiety, behaviors, emotional issues, sleep problems and night terrors.

{¶ 78} At the time of trial, C.B. was thriving in his foster home, he was very bonded with his foster family and his foster parents wished to adopt C.B. if possible. The foster mom described the tremendous improvements C.B. has made while at her home, and how C.B. continues to progress and have his medical needs met. The GAL testified she did not believe C.B. could be safely or reasonably reunified with his parents.

{¶ 79} We therefore find the manifest weight of the evidence in the record supports the juvenile court's decision that pursuant to R.C. 2151.414(B)(1)(a) and R.C. 2151.414(E)(1) and (4), C.B. cannot and should not be placed with father within a reasonable period of time, and pursuant to R.C. 2151.414(D)(1)(a) through (e), an award of permanent custody to the agency is in C.B.'s best interest.

{¶ 80} We conclude that while the juvenile court erred in finding pursuant to R.C. 2151.414(B)(1)(d), that C.B. had been in the temporary custody of the agency for more than 12 months of a consecutive 22-month period, this error is harmless, as there is an

26.

abundance of evidence in the record to support the juvenile court's finding under R.C.

2151.414(B)(1)(a).

{¶ 81} Accordingly, we find father's sole assignment of error not-well taken.

{¶ 82} On consideration whereof, the judgment of the Huron County Court of

Common Pleas, Juvenile Division, is affirmed.  Father is ordered to pay the costs of this

appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27.
*See also* 6th Dist.Loc.App.R. 4.


Thomas J. Osowik, J.                       _____
                                                             JUDGE
Gene A. Zmuda, J.

Myron C. Duhart, J.                        _____
CONCUR.                                                  JUDGE

                                                    _____
                                                             JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.