[Cite as *In re C.H.*, 2026-Ohio-1658.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| IN RE C.H. | : | |
| | | Nos. 115580 and 116147 |
| A Minor Child | : | |
| | | |
| [Appeal by Father, C.S.] | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** May 7, 2026

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. AD23905859

### *Appearances:*

Brian A. Smith Law Firm, LLC and Brian A. Smith, *for appellant*.

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Joseph C. Young, Assistant Prosecuting Attorney, *for appellee*.

TIMOTHY W. CLARY, J.:

{¶ 1} Appellant-father C.S. ("Father") appeals from the juvenile court's judgment granting permanent custody of his minor child C.H. to appellee, Cuyahoga County Division of Children and Family Services ("CCDCFS" or "the agency"). Father raises the following assignments of error for review:

1. The trial court's ruling in Case Number AD-23-905859, granting appellee's motion to modify temporary custody to permanent custody to CCDCFS, was against the manifest weight of the evidence, because appellee failed to prove, by clear and convincing evidence, that permanent custody was in the best interest of the minor child.

2. The failure of appellant's counsel to object to the trial court's finding that "the child has been in the temporary custody of the Cuyahoga County Division of Child and Family Services which is twelve (12) or more months of a consecutive twenty-two (22) month period," in the November 7, 2024 magistrate's decision, as required by Juv.R. 40(D)(3)(a)(iii), constituted ineffective assistance of counsel, in violation of appellant's right to counsel under the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution.

3. The trial court's ruling in Case Number AD-23-905859, granting appellee's motion to modify temporary custody to permanent custody to CCDCFS, was not supported by sufficient evidence and constituted plain error, because the trial court held, in granting permanent custody to the agency, that "the child has been in the temporary custody of the Cuyahoga County Division of Child and Family Services which is twelve (12) or more months of a consecutive twenty-two (22) month period," when those time requirements had not been met at the time appellee's motion to modify temporary custody to permanent custody to CCDCFS was filed.

{¶ 2} After careful review of the record and relevant case law, we affirm the juvenile court's judgment.

## I. Procedural and Factual History

{¶ 3} V.N.H. ("Mother"), now deceased, and Father are the biological parents of C.H. (d.o.b. May 13, 2023). On May 16, 2023, CCDCFS filed a complaint for temporary custody, alleging that C.H. was abused and dependent as defined in R.C. 2151.031(D) and 2151.04(D). The allegations supporting the complaint included the following particulars:

1. Mother has a substance abuse issue that interferes with her ability to provide appropriate care to the child. At the time of the child's birth, both mother and the child tested positive for cocaine.

2. Mother has mental health issues that interfere with her ability to provide appropriate care to the child. Mother was previously engaged in mental health treatment services but has since disengaged and stopped taking her prescribed medications.

3. Mother is unable to meet the basic needs of the child. Mother lacks independent housing and the provisions needed to appropriately care for the child.

4. Mother has two older children who were adjudicated neglected and dependent, due in part to Mother's substance abuse and mental health issues. Though the children were briefly returned to her care, the children were ultimately placed in the legal custody of a relative. See Case Nos. AD19912027-28. Mother also has another child who is placed in the legal custody of a relative, due to Mother's substance abuse issues. See Case No. CU16117689.

5. Alleged father, [C.S.], has yet to establish paternity and refuses to provide care for the child.

Following a hearing held the same day, the child was committed to the emergency temporary care of the agency.

{¶ 4} On August 1, 2023, a hearing on CCDCFS's complaint for temporary custody was held before a magistrate. At the conclusion of the hearing, the magistrate found the allegations of an amended complaint were proven by clear and convincing evidence.[1] Accordingly, the child was adjudicated abused and dependent and was placed in the temporary custody of the agency. On August 18, 2023, the

---

[1] At the hearing, CCDCFS made an oral motion to amend the complaint. The allegations against Mother were not altered. However, the complaint was modified to require Father to establish paternity, establish a relationship with the child, and complete parenting services.

juvenile court adopted the magistrate's decision and approved a case plan for reunification that was developed to address concerns with Father's paternity and parenting skills. The case plan was later amended to include objectives relating to the child's special needs and Father's alcohol abuse.

**{¶ 5}** On November 15, 2023, CCDCFS filed a motion for permanent custody of the child pursuant to R.C. 2151.413. The motion was supported by the affidavit of CCDCFS social worker, Sophia George ("George"), who alleged that Father (1) did not establish paternity, (2) refuses to interact with the agency, (3) does not support, visit, or communicate with the child, and (4) has abandoned the child.

**{¶ 6}** On November 30, 2023, CCDCFS filed a motion pursuant to Civ.R. 25, notifying the juvenile court that Mother had unexpectedly passed away on November 28, 2023. Accordingly, the case proceeded with Father alone.

**{¶ 7}** On May 3, 2024, Father filed a motion for legal custody, stating that he was progressing with his case plan and was "ready, willing, and able to care for the child."

**{¶ 8}** Following several continuances, the matter proceeded to a trial before a magistrate on November 6, 2024. On behalf of the agency, Lorettta Muhammad ("Muhammad"), testified that she is employed as a social worker with CCDCFS and was assigned to the child's case in March 2024. Muhammad outlined the procedural history of the case and explained the circumstances that caused the child to be removed from Mother's care in May 2023. Muhammad also discussed Father's interaction with the agency and Mother's subsequent death in November 2023.

**{¶ 9}** During the pendency of this case, a case plan for reunification was developed, and amended as appropriate, to assist Father in addressing the agency's ongoing concerns. In pertinent part, the case plan required Father to (1) contact Child Support Enforcement Agency and cooperate with the establishment of paternity; (2) complete a complete a cognitive assessment, follow all recommendations from the assessment, and sign a release of information; (3) successfully complete an intensive outpatient alcohol treatment program, and (4) work with a parenting coach to learn how to bond with the child, attend medical appointments to learn how to attend to the child's medical needs, and follow all parenting recommendations.

**{¶ 10}** Muhammad confirmed that Father established paternity of the child in March 2024. She explained that the substantial delay in establishing paternity was caused by (1) Father's "inability to make himself available to the agency" and (2) various difficulties associated with obtaining the child's birth records. (Tr. 36.) After paternity was established, Father's involvement and cooperation with the agency improved in May 2024. (Tr. 37.)

**{¶ 11}** Muhammad testified that mental-health objectives were included in Father's case plan because he did not seem to "understand" or "comprehend" the child's basic needs. Muhammad confirmed that Father completed a mental-health assessment and that there was no recommendation for further services. Nevertheless, the agency continued to have concerns with Father's ability to "retain information and understand instructions." (R. 250.)

{¶ 12} Regarding the substance-abuse component of the case plan, Muhammad testified that the agency became concerned with Father's alcohol consumption when an odor of alcohol was detected during a supervised visit with the child. The agency began testing Father for alcohol, and he tested positive on two occasions. Father's last positive alcohol screen was in September 2024. In October 2024, Father completed a drug and alcohol assessment and is currently participating in an intensive outpatient treatment program at New Visions. Muhammad confirmed that Father is actively engaged in his treatment. He is "attending all meetings" and is "doing well" in the program. (Tr. 12.) However, the alcohol abuse services were ongoing and, therefore, not completed at the time of trial.

{¶ 13} With respect to the child's special needs, Muhammad testified that C.H. has significant medical conditions, including cerebral palsy, that require occupational therapy, physical therapy, speech therapy, and frequent medical appointments in Akron, Ohio. Muhammad testified that Father has not received any training to deal with the child's special needs.

{¶ 14} Father did not own a vehicle and lacked personal transportation to and from the child's medical appointments. In June 2024, the agency began providing Father with bus passes to attend C.H.'s weekly appointments. However, Father has only attended one appointment during the pendency of this case. In the past, Father expressed that he was unwilling to travel to Akron for certain medical appointments because it "didn't make any sense" to attend shorter appointments.

(Tr. 14.) Father stated, on the week of trial, that he would attend additional appointments in the future; however, he remained noncommittal, stating that "he couldn't make it to every one of [C.H.'s] appointments." (Tr. 14.) Muhammad also testified that Father failed to participate in agency meetings relating to C.H., including semiannual reviews ("SARs"), family team meetings, or provider meetings, despite efforts by CCDCFS to engage him in these appointments. (Tr. 38.)

{¶ 15} Muhammad confirmed that Father completed an interactive parenting program with a parenting coach in August 2024. However, Muhammad stated that the parenting program recommended that Father participate in additional services, including a "nurturing parenting class" that would provide Father with further information regarding the child's basic needs. The class was scheduled to begin approximately two weeks after the permanent custody hearing was held.

{¶ 16} In April 2024, Father began attending weekly supervised visits with C.H. Initially, Father was reluctant or unwilling to bottle feed C.H. or change her diaper as needed. (Tr. 16.) Muhammad testified that Father's interactions with the child "dramatically improved" after the agency appointed a parenting coach. However, Muhammad continued to have concerns with Father's parenting and his ability to meet the child's basic needs. Muhammad stated, for example, that Father did not adhere to C.H.'s feeding schedule during visits. In addition, Father gave C.H. a gummy candy, "which was a choke hazard," despite being told not to do so, "and she swallowed it whole." (Tr. 15 and 17.) Father also refused agency assistance to

learn to use his phone for virtual visits with C.H. or with her medical providers, stating that he would "figure it out" himself, but he never did so. (Tr. 39-40.)

{¶ 17} Stable and appropriate housing also remained a concern for the agency. At the time of trial, Father was living in a one-bedroom apartment located on the twentieth floor of a senior housing facility. Significantly, the facility has age restrictions and does not allow children over the age of 18 months to reside in the building. Muhammad testified that Father has attempted to find other housing without success. Muhammad conceded, however, that Father may be eligible for additional housing services though the Cuyahoga Metropolitan Housing Authority ("CMHA") if he was awarded custody of C.H.

{¶ 18} Finally, Muhammad provided extensive testimony concerning the child's current placement in a foster home. Muhammad stated that the child has been in the continuous care of the foster family since her birth. C.H. is "happy" and has developed a strong bond with the foster parents and their biological children. The foster parents attend C.H.'s medical appointments and are meeting the child's special needs. Muhammad further testified that the agency attempted to identify suitable relatives for placement. Their efforts, however, proved unsuccessful. On the eve of trial, CCDCFS began investigating the child's paternal grandmother as a potential placement. However, the agency needed additional time to investigate the relative's suitability for placement because Father had only provided the paternal grandmother's contact information in the days preceding trial.

{¶ 19} At the close of the agency's case, Father elected to testify on his own behalf. Father testified that he established paternity during the pendency of this case and has been actively participating in supervised visits with the child to facilitate reunification. According to Father, he is currently enrolled in a drug and alcohol program though New Visions to address the agency's concerns with his alcohol consumption. Father testified that he is also enrolled in a parenting program through Passages and participates in weekly meetings. Lastly, Father confirmed that he is living in a senior housing facility through CMHA. Father testified that he has spoken with CMHA about his child and they have offered to help him secure appropriate housing in the future.

{¶ 20} At the conclusion of trial, the court heard from the child's guardian ad litem, Pamela Hawkins, Esq. (the "GAL"). Consistent with the recommendations of the agency's employees, the GAL recommended that permanent custody be granted in favor of CCDCFS. The GAL summarized her position as follows:

> At this time, it is unfortunate that mother passed away, but mother had a long history of substance abuse struggles. I've been acquainted with mother for a number of years as I worked with her with her other children.
>
> Father had — since paternity was established, father has started engaging. Part of the issue with getting paternity established is they needed a birth certificate. Because the child was born at home, unattended, not in a hospital, they had trouble getting the birth certificate. So this process, the paternity process, took much longer that it normally does. But father has established paternity.
>
> I've been to the apartment he currently lives in. It's a one bedroom, it's senior housing, where unfortunately, once she turns 18 months, she's no longer able to live in that housing. Father has indicated that he would be willing to move to secure housing where he could have his

child.  Father has been consistent with his visitation since paternity was established.

At this point, my concern is that this is a special needs child.  She has cerebral palsy. . . . And because she is so young, it is at this point unknown how much the cerebral palsy is going to impact her life, but it will impact her life the rest of her life.  The question will be what kind of services will need to be wrapped around her.  I don't doubt father's desire to parent his child.  I don't doubt father's love for his child.  I just have concerns that she gets all of the services she needs if he's having trouble with transportation, getting to visitation, if he's having trouble getting to medical appointments.

So at this point, permanent custody is my recommendation because this is a special needs child who is going to need a great deal of intensive care.

(Tr. 55-57.)

{¶ 21} On November 7, 2024, the magistrate issued a decision, recommending that the child be placed in the permanent custody of CCDCFS.  On November 12, 2024, well within the 14-day time period allotted to file objections, Father filed his objections to the magistrate's decision along with a request for a transcript of the proceedings.  On November 20, 2024, the juvenile court granted Father's request for a transcript.  Just two days later, and before Father was able to file the transcript, the juvenile court issued an entry in which it overruled Father's objections and ordered the child be placed in the permanent custody of CCDCFS.  Thereafter, Father filed a timely appeal from the juvenile court's judgment.

{¶ 22} On May 22, 2025, this court reversed the juvenile court's judgment, finding the court abused its discretion by prematurely adopting the magistrate's decision without waiting for the transcript to be submitted in order to conduct the independent review required by Juv.R. 40(D)(4)(d).  *In re C.H.*, 2025-Ohio-1838

(8th Dist.). Accordingly, the matter was remanded to the juvenile court "with instructions for the court to permit appellant to file the requested transcript and to then conduct the independent review required by Juv.R. 40(D)(4)(d) regarding father's objections." *Id*. at ¶ 10.

{¶ 23} On remand, the juvenile court complied with this court's mandate and issued a journal entry (1) overruling Father's objections to the magistrate's decision, (2) denying Father's motion for legal custody, and (3) granting the agency's motion for permanent custody, thereby terminating Father's parental rights. This timely appeal followed.

## II. Law and Analysis

### A. Sufficiency and Manifest Weight of the Evidence

{¶ 24} In the first and third assignments of error, Father argues the juvenile court's judgment granting permanent custody to CCDCFS is not supported by sufficient evidence and is against the manifest weight of the evidence. Father contends that the juvenile court's judgment (1) erroneously applied the "12 of 22 months rule" as contemplated under R.C. 2151.414(B)(1)(d), (2) disregarded the efforts he took to comply with his case-plan objectives, and (3) failed to adequately consider the progress he made during the pendency of the case. Because these assignments of error are related, we address them together for the ease of discussion.

{¶ 25} We take our responsibility in reviewing cases involving the termination of parental rights and the award of permanent custody very seriously.

A parent has a "'fundamental liberty interest' in the care, custody and management" of his or her child, *In re Murray*, 52 Ohio St.3d 155, 156 (1990), quoting *Santosky v. Kramer*, 455 U.S. 745, 753 (1982), and the right to raise one's own child is "'an essential and basic civil right.'" *In re N.B.*, 2015-Ohio-314, ¶ 67 (8th Dist.), quoting *In re Hayes*, 79 Ohio St.3d 46, 48 (1997). However, this right is not absolute. It is "'always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.'" *In re L.D.*, 2017-Ohio-1037, ¶ 29 (8th Dist.), quoting *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979).

{¶ 26} Because the termination of parental rights is "'the family law equivalent of the death penalty in a criminal case,'" it is "an alternative [of] last resort." *In re J.B.*, 2013-Ohio-1704, ¶ 66 (8th Dist.), quoting *In re Hoffman*, 2002-Ohio-5368, ¶ 14; *In re Gill*, 2002-Ohio-3242, ¶ 21 (8th Dist.). It is, however, "sanctioned when necessary for the welfare of a child." *In re M.S.*, 2015-Ohio-1028, ¶ 7 (8th Dist.), citing *In re Wise*, 96 Ohio App.3d 619, 624 (9th Dist. 1994). All children have "'the right, if possible, to parenting from either natural or adoptive parents which provides support, care, discipline, protection and motivation.'" *In re J.B.* at ¶ 66, quoting *In re Hitchcock*, 120 Ohio App.3d 88, 102 (8th Dist. 1996). Where parental rights are terminated, the goal is to create "a more stable life" for dependent children and to "facilitate adoption to foster permanency for children." *In re N.B.* at ¶ 67, citing *In re Howard*, 1986 Ohio App. LEXIS 7860, 5 (5th Dist. Aug. 1, 1986).

### 1. Standard of Review

{¶ 27} R.C. 2151.414 provides a two-prong analysis to be applied by a juvenile court in adjudicating a motion for permanent custody. *In re S.C.*, 2018-Ohio-2523, ¶ 20 (8th Dist.), citing R.C. 2151.414(B). This first prong of this statute authorizes the juvenile court to grant permanent custody of a child to the public agency if, after a hearing, the court determines, by clear and convincing evidence, that any of the following factors apply: (a) the child is not abandoned or orphaned, but the child cannot be placed with either parent within a reasonable time or should not be placed with the child's parents; (b) the child is abandoned; (c) the child is orphaned, and there are no relatives of the child who are able to take permanent custody; (d) the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for 12 or more months of a consecutive 22-month period; or (e) the child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state. R.C. 2151.414(B)(1)(a)-(e).

{¶ 28} In accordance with the second prong of R.C. 2151.414, when any one of the above factors exists, the juvenile court must then analyze whether, by clear and convincing evidence, it is in the best interest of the child to grant permanent custody to the agency pursuant to R.C. 2151.414(D). "'Clear and convincing evidence is that measure or degree of proof which is more than a mere "preponderance of the evidence," but not to the extent of such certainty as is required "beyond a reasonable doubt" in criminal cases, and which will produce in the mind of the trier of facts a

firm belief or conviction as to the facts sought to be established.'" *In re Z.C.,* 2023-Ohio-4703*, ¶* 7, quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶ 29} The Supreme Court of Ohio clarified the standard of review in permanent custody cases, explaining that

> [g]iven that R.C. 2151.414 requires that a juvenile court find by clear and convincing evidence that the statutory requirements are met . . . the sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence standards of review are the proper appellate standards of review of a juvenile court's permanent-custody determination, as appropriate depending on the nature of the arguments that are presented by the parties.

*In re Z.C.* at ¶ 11.

{¶ 30} In reviewing the sufficiency challenge herein, we must examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof. *See id.* at ¶ 12, citing *Cross* at 477. "When reviewing for manifest weight, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *Id.* at ¶ 14, citing *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20.

{¶ 31} With respect to Father's challenge to the weight of the evidence supporting the juvenile court's judgment in this case, the Ohio Supreme Court has

emphasized the importance of affording appropriate deference to the finder of fact, stating:

> "In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact." [*Eastley*] at ¶ 21. "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). "'If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment.'" *Id.* at fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 603, at 191-192 (1978).

*Id.* at ¶ 14.

### 2. First Prong — R.C. 2151.414(B)

{¶ 32} Regarding the first prong of the permanent-custody analysis, the juvenile court found, pursuant to R.C. 2151.414(B)(1)(a), that the child could not be placed with either parent within a reasonable time or should not be placed with either parent. Alternatively, the juvenile court found, pursuant to R.C. 2151.414(B)(1)(d), that the child has been in the temporary custody of CCDCFS for 12 or more months of a consecutive 22-month period.

{¶ 33} As an initial matter, we must address Father's argument regarding the juvenile court's decision to grant permanent custody to CCDCFS on the basis that C.H. "has been in temporary custody of a public children services agency or private child placing agency for twelve or more months of a consecutive twenty-two-month period" as set forth in R.C. 2151.414(B)(1)(d). Specifically, Father contends

that the juvenile court improperly relied on division (B)(1)(d) because C.H. had been in the agency's temporary care for less than 12 months when the motion for permanent custody was filed.[2] In response, CCDCFS acknowledges that the juvenile court could not consider the length of custody for the purposes of R.C. 2151.414(B)(1)(d).[3] The agency argues, however, that the juvenile court did not commit reversible error because the court also included appropriate findings in satisfaction of R.C. 2151.414(B)(1)(a). After careful consideration, we agree with the agency's position.

{¶ 34} This court has addressed this issue under analogous circumstances in the past. In each instance, we have recognized that a trial court's erroneous finding under R.C. 2151.414(B) "'does not preclude us from finding that the trial court's judgment [awarding permanent custody to the agency] is nevertheless correct.'" *In re T.T.*, 2024-Ohio-2914, ¶ 17 (8th Dist.), quoting *In re J.T.*, 2004-Ohio-5797, ¶ 36 (2d Dist.). This is because only one of the circumstances set forth in R.C.

---

[2] Father concedes that this argument was not raised in his objections to the magistrate's decision. Thus, his argument is limited to the plain-error standard. Juv.R. 40(D)(3)(b)(iv). "Plain error is not favored and is only applicable in rare cases where the error 'seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself.'" *In re S.H.*, 2014-Ohio-4476, ¶ 12 (8th Dist.), quoting *S.J. v. J.T.*, 2011-Ohio-6316, ¶ 8 (6th Dist.).

[3] It is well settled that R.C. 2151.414(B)(1)(d) "clearly provides parents with 12 months to demonstrate their ability and fitness to care for their child before an agency can move for permanent custody on R.C. 2151.414(B)(1)(d) grounds." *In re C.W.*, 2004-Ohio-6411, ¶ 25. Significantly, however, "the time that passes between the filing of a motion for permanent custody and the permanent-custody hearing does not count toward the 12-month period set forth in R.C. 2151.414(B)(1)(d)." *Id.* at ¶ 26. In this case, the motion for permanent custody was filed before the 12-month period contemplated under the statute had elapsed.

2151.414(B)(1)(a) to (e) needs to apply in order to satisfy the first prong of the two-part permanent custody test. *In re A.R.*, 2025-Ohio-4378, ¶ 35 (8th Dist.). Applying these principles, we have routinely held that a juvenile court's erroneous reliance on R.C. 2151.414(B)(1)(d) is "harmless" where the record supports the trial court's alternative finding under R.C. 2151.414(B)(1)(a). *See, e.g., In re R.D.W.*, 2021-Ohio-4304, ¶ 25 (8th Dist.), citing *In re S.C.*, 2019-Ohio-3664, ¶ 72 (8th Dist.). Other Ohio districts have reached similar conclusions. *In re C.B.*, 2024-Ohio-5352 (6th Dist.); *In re T.B.*, 2020-Ohio-4040 (9th Dist.); *In re M.F.*, 2015-Ohio-4224 (3d Dist.); *In re D.C.*, 2015-Ohio-3178, ¶ 34 (12th Dist.). Accordingly, we must consider whether the juvenile court's alternative reliance on R.C. 2151.414(B)(1)(a) is supported by clear and convincing evidence.

{¶ 35} When assessing whether a child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents under R.C. 2151.414(B)(1)(a), a juvenile court must consider the factors outlined in R.C. 2151.414(E). *In re A.V.*, 2014-Ohio-5348, ¶ 58 (8th Dist.). A juvenile court is only required to find that one of these factors is met in order to properly find that a child cannot or should not be placed with a parent. *In re Ca.T.*, 2020-Ohio-579, ¶ 27 (8th Dist.), citing *In re V.C.*, 2015-Ohio-4991, ¶ 42 (8th Dist.).

{¶ 36} In this case, the juvenile court found C.H. could not be placed with either parent within a reasonable time or should not be placed with either parent

pursuant to the factors outlined in R.C. 2151.414(E)(1), (4), and (14).[4] These provisions provide as follows:

> (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.
>
> . . .
>
> (4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child. . . .
>
> . . .
>
> (14) The parent for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect.

{¶ 37} After careful consideration, we find the record supports the juvenile court's determination that C.H. clearly and convincingly could not or should not be placed with either parent within a reasonable time. In this case, C.H. was removed from Mother's care at the time of her birth based on Mother's extensive history with CCDCFS and her associated history of substance abuse and mental-health issues.

---

[4] The juvenile court further considered, pursuant to R.C. 2151.414(E)(16), that Mother is deceased.

After the complaint was filed, the agency worked with Father to establish paternity and to facilitate a relationship with the child. Initially, however, Father refused to interact with CCDCFS and was not supporting, visiting, or communicating with C.H.

{¶ 38} Several months after the motion for permanent custody was filed, Father finally engaged with the agency. He established paternity and began to participate in visitation and recommended case-plan services. At the time of trial, however, the agency had ongoing concerns with Father's ability to provide the child with a permanent home based on his failure to successfully complete his case-plan objectives for reunification. Specifically, Father had yet to complete his alcohol treatment program and was recommended to participate in an additional parenting course based on ongoing concerns with his parenting skills. Mohammad explained that although Father's parenting skills improved with the assistance of a parenting coach, additional parenting services and training were necessary. Mohammad stated, for example, that Father often failed to comprehend what C.H. "was capable of doing" or eating at such a young age. (Tr. 17.) Mohammad also stated that Father relied heavily on the directives of agency employees during the supervised visits and required further education regarding "the basic needs of the child, like, a feeding schedule, changing, and things like that." (Tr. 13 and 16-17.)

{¶ 39} Additionally, the testimony adduced at trial demonstrated that Father has consistently failed to attend C.H.'s weekly medical appointments and has demonstrated an unwillingness to develop the understanding and skills that are needed to meet the child's special needs and medical requirements. Mohammad

testified that C.H. had various medical conditions that require her to attend multiple medical appointments per week at various locations. (Tr. 13.) Thus, the agency believed that it was important for Father to receive appropriate training regarding C.H.'s special needs by attending her medical appointments. Trial testimony established that Father only attended one such appointment during the pendency of this case despite being offered transportation assistance since June 2024. Father also refused agency assistance to attend appointments virtually and expressed that it "didn't make sense" to attend all appointments in person. Viewed collectively, the record supports the juvenile court's determination that Father had "not availed himself of any training or how to care for this child." (Tr. 68-69.)

{¶ 40} Finally, the record shows that Father has not secured appropriate housing for the child. Father currently resides in an elderly housing facility that cannot accommodate C.H. because the facility does not allow children over the age of 18 months. Despite having ample time to do so, Father has not taken the necessary steps to find an adequate permanent home, and his access to appropriate housing in the future is speculative at this time.

{¶ 41} Under these circumstances, we find sufficient evidence supports the juvenile court's findings under R.C. 2151.414(E). While the evidence demonstrates that Father has complied with aspects of his case-plan objectives, it equally highlighted his failure or unwillingness to address the agency's substantial concerns with his ability to adequately care for the young child and her special needs within a reasonable period of time. Moreover, we are unable to conclude that the juvenile

court's findings were against the manifest weight of the evidence. The juvenile court was presented with all relevant information at trial and was in the best position to weigh the evidence going to each R.C. 2151.414(E) factor. Accordingly, we find clear and convincing evidence supported the juvenile court's conclusion that C.H. could not or should not be placed with either parent within a reasonable time pursuant to R.C. 2151.414(B)(1)(a). For these same reasons, we find the juvenile court's brief reference to the circumstances contemplated under R.C. 2151.414(B)(1)(d) did not seriously affect the basic fairness, integrity, or reputation of the judicial process.

### 3. Second Prong: Best Interests of the Child

{¶ 42} Having determined that competent and credible evidence supports the juvenile court's finding that the child could not or should not be returned to either parent within a reasonable time, we now turn to the second prong of our analysis, which requires the court to determine, by clear and convincing evidence, whether it is in the best interest of the child to grant permanent custody to the agency pursuant to R.C. 2151.414(D).

{¶ 43} "In determining the best interest of a child, a juvenile court 'may apply one of two different tests.'" *In re S.C.,* 2022-Ohio-356, ¶ 38 (10th Dist.), quoting *In re J.P.,* 2019-Ohio-1619, ¶ 39 (10th Dist.). "'Under R.C. 2151.414(D)(1), the juvenile court weighs multiple factors . . . to decide whether granting an agency permanent custody of a child is in that child's best interest.'" *Id.,* quoting *In re J.P.* at ¶ 39. "By contrast, 'under R.C. 2151.414(D)(2), if the juvenile court makes [each of] the four enumerated findings, permanent custody is per se in the child's best

interest and the court "shall" commit the child to the permanent custody of the agency.'" *Id.*, quoting *In re J.P.* at ¶ 39. "These two provisions 'are alternative means for reaching the best-interest determination.'" *Id.*, quoting *In re J.P.* at ¶ 40.

{¶ 44} In this case, the juvenile court applied R.C. 2151.414(D)(1). The statute requires the juvenile court to consider all relevant factors in determining whether the child's best interests would be served by granting permanent custody. These factors include (a) the interaction and interrelationship of the child with the child's parents; (b) the child's wishes, as expressed directly by the child or through the child's GAL; (c) the child's custodial history; (d) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (e) whether any of the factors set forth in R.C. 2151.414(E)(7)-(11) apply. R.C. 2151.414(D)(1).

{¶ 45} A juvenile court must consider each of the R.C. 2151.414(D)(1) factors when making a permanent custody determination, but no one factor is given greater weight than the others. *In re Schaefer*, 2006-Ohio-5513, ¶ 56. Only one of the factors set forth in R.C. 2151.414(D)(1) needs to be resolved in favor of permanent custody. *In re D.H.*, 2022-Ohio-2780, ¶ 46 (8th Dist.), citing *In re G.W.*, 2019-Ohio-1533, ¶ 72 (8th Dist.). Furthermore, the Ohio Supreme Court has held that "R.C. 2151.414(D)(1) does not require a juvenile court to expressly discuss each of the best interest factors in R.C. 2151.414(D)(1)(a) through (e). Consideration is all the statute requires." *In re A.M.*, 2020-Ohio-5102, ¶ 31.

{¶ 46} After careful consideration of the testimony presented at the permanent custody hearing, we find sufficient evidence in the record supports the juvenile court's reliance on the factors set forth under R.C. 2151.414(D). Moreover, we cannot say that this is the exceptional case where the juvenile court lost its way and created a manifest miscarriage of justice in evaluating the best-interest factors.

{¶ 47} First, with respect to the child's relationship with her parents, siblings, relatives, and foster parents, there is no dispute that the child does not share a relationship with her biological mother who is now deceased. The record further reflects that the child has developed a strong bond with the foster family. The child has remained in the foster family's continuous and uninterrupted care since birth. C.H. is "happy" in the foster family's home and her basic and special needs are being met. Regarding Father, trial testimony indicated that Father has participated in supervised visits with the child since April 2024. (Tr. 11.) As mentioned, Father has demonstrated some improvement in his parenting skills over the duration of this case. Nevertheless, the agency continued to have concerns about his ability to appropriately care for the child because he (1) has not completed a recommended parenting course, (2) needs additional training regarding the child's basic needs, (3) and failed to attend medical appointments to learn how to attend to the child's special needs. Father has also failed to secure appropriate housing or complete the alcohol abuse component of his case plan that was added after the agency smelled alcohol on Father's person while he was interacting with the child.

{¶ 48} Under R.C. 2151.414(D)(1)(b), it is proper for the juvenile court to consider the GAL's recommendation where the children are too young to express their wishes. *In re M.D.*, 2022-Ohio-2672, ¶ 35 (8th Dist.). Here, C.H. was one year old at the time of the permanent custody hearing. Although the child could not formulate a meaningful expression of her wishes at the custody hearing, the GAL spoke on the child's behalf and recommended permanent custody to CCDCFS. Noting the child's medical conditions and her need for continuous, intensive care, the GAL believed that permanent custody was in the child's best interests.

{¶ 49} Regarding the (D)(1)(c) and (d) factors, there is no dispute that the agency was unable to identify a suitable relative for placement and that the child has remained in the agency's custody since May 2023. The record further demonstrated that C.H. was in need of a legally secure placement that could not be achieved without an order of permanent custody. As discussed, the juvenile court's conclusion that the child could not be placed with a parent within a reasonable time or should not be placed with either parent was supported by findings consistent with R.C. 2151.414(E), any of which mandate that legal conclusion. Father had approximately 18 months to take the necessary steps to remedy the substantial issues that caused the child to be placed in the agency's care. Although Father engaged in certain recommended services, his inaction or unwillingness to address each of the agency's concerns, particularly the child's significant medical needs, demonstrated that he was unable to provide the child with a permanent and stable home as of the date of trial.

{¶ 50} Balancing the foregoing factors, the juvenile court was free to conclude that the ultimate welfare of the child would be better served by an award of permanent custody. CCDCFS provided clear and convincing evidence regarding C.H.'s custodial history, her need for legally secure permanent placement, and the significant issues Father has yet to resolve. Accordingly, we find the juvenile court's award of permanent custody to CCDCFS is supported by sufficient evidence and is not contrary to the manifest weight of the evidence.

{¶ 51} The first and third assignments of error are overruled.

### B. Ineffective Assistance of Trial Counsel

{¶ 52} In the second assignment of error, Father argues trial counsel rendered ineffective assistance of counsel by "failing to object to the trial court's finding, made in both the November 7, 2024 magistrate's decision and in the August 20, 2025 judgment entry adopting the magistrate's decision, that 'the child has been in the temporary custody of the Cuyahoga County Division of Child and Family Services which is twelve (12) or more months of a consecutive twenty-two (22) month period.'" Father contends that he was prejudiced by counsel's deficient performance, reiterating his previous argument that R.C. 2151.414(B)(1)(d) was inapplicable because the motion for permanent custody was filed when C.H. was just six months old.

{¶ 53} "An indigent parent is entitled to the effective assistance of appointed counsel when the state seeks to terminate [his or her] parental rights." *In re A.C.*, 2013-Ohio-1802, ¶ 45 (8th Dist.), citing *In re L.C.*, 2022-Ohio-1592, ¶ 55. (8th Dist.).

"[T]he test for ineffective assistance of counsel used in criminal cases is equally applicable in actions seeking to force the permanent, involuntary termination of parental custody." *In re J.C.*, 2025-Ohio-4380, ¶ 19 (8th Dist. 1988). To prevail on a claim of ineffective assistance of counsel, the defendant must show both deficient performance and resulting prejudice. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

{¶ 54} Having determined that the court's reliance on R.C. 2151.414(B)(1)(d) was harmless given the competent and credible evidence supporting the court's findings under R.C. 2151.414(B)(1)(a) and (E), we are unable to conclude that Father was prejudiced by counsel's performance below. Accordingly, we find his ineffective-assistance-of-counsel claim to be without merit.

{¶ 55} The second assignment of error is overruled.

{¶ 56} Judgment affirmed.

It is ordered that appellee recover from appellant the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
TIMOTHY W. CLARY, JUDGE

EILEEN T. GALLAGHER, P.J., and
EILEEN A. GALLAGHER, J., CONCUR